UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:19-cr-152-TWP-MJD |
| | ) |
| ROBERT MASON ELLIOTT | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON SECOND MOTION TO DETERMINE COMPETENCY**

This matter came before the Court on Defendant's Motion for Second Competency Evaluation, pursuant to 18 U.S.C. § 4241(a), to determine the mental competency of Defendant Robert Mason Elliott's ("Elliott") (Filing No. 136). For the reasons stated in this Entry, the Court **determines** that Elliott is presently competent to stand trial and assist his attorney in his defense.

## I.   FINDINGS OF FACT

**A.   Procedural Background**

Elliott was arrested and brought into federal custody on January 8, 2019. He was charged in a Second Superseding Indictment with sixteen counts of criminal conduct on October 9, 2019. In particular, Elliott is charged with two counts of Murder for Hire, in violation of Title 18, U.S.C. § 1958(a); one count of Conspiracy to Commit Murder for Hire, in violation of Title 18, U.S.C. § 1958(a); two counts of Tampering with a Witness, Victim, or Informant, in violation of Title 18, U.S.C. §§ 1512(a)(1) and 2; five counts of Sexual Exploitation of a Child, in violation of Title 18, U.S.C. § 2251(a); one count of Coercion and Enticement, in violation of Title 18, U.S.C. § 2422(b); five counts of Distribution of Child Pornography, in violation of Title 18, U.S.C. § 2522(a)(2); and

one count of Felon in Possession of a Firearm and Ammunition, in violation of Title 18, U.S.C. § 922(g)(1). (Filing No. 64.)

On July 29, 2019, Elliott's attorney filed a sealed motion asking the Court to determine Elliott's mental competency and provided notice of an insanity defense. (Filing No. 60.) The Court granted the request and Elliott was committed to the custody of a suitable facility for examination pursuant to 18 U.S.C. §§ 4241 and 4247, where Elliott's mental health condition could be evaluated. (Filing No. 59). David M. Szyhowski, Psy.D., Licensed Clinical Psychologist ("Dr. Szyhowski") evaluated Elliott at the Metropolitan Correctional Center Chicago ("MCC"), in Chicago, Illinois, from August 19, 2019 through December 2019. Following his examination, Dr. Szyhowski submitted a report to the Court in accordance with 18 U.S.C. § 4247(b) and (c) in which he opined that Elliott does not appear to be suffering from any severe mental disease or defect that has impacted his ability to understand the legal proceedings and to properly assist his counsel. (Filing No. 83-1.) As previously summarized by the Court, despite a history of significant symptoms of self-injury and affective distress, Dr. Szyhowski opined that:

> Elliott appeared largely asymptomatic for that presentation during his stay at MCC. *Id*. Although there was some indication of poor impulse control and labile emotions, these appeared to be "part of his general personality and were not noted to have caused any significant impairment in his capacity to manage his behaviors." *Id*. at 14. Dr. Szyhowski further opined that Elliott "demonstrated the capacity to factually and rationally understand the nature and consequence of the legal proceedings and had the capacity to work cooperatively [with counsel] in formulating a defense strategy for this criminal case." *Id*.

(Filing No. 87 at 4).

A hearing to determine competency was held on January 15, 2020. Based upon the evidence submitted and argument of counsel, the Court determined that Elliott was not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he

2

is unable to understand the nature and consequences of the proceedings against him, or to assist properly in his defense. *Id*. at 7.

On August 26, 2021, Elliott's new counsel, Brandon Sample ("Mr. Sample"), filed Defendant's Motion for Second Competency Evaluation. (Filing No. 136.) The request was based on "counsel's reasonable, professional judgment" that Elliott is unable to "assist properly in his defense" and does not have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Id*. at 4. The Motion was granted and Elliott arrived at MCC on October 26, 2021, for a second forensic evaluation. He was initially again assigned to Dr. Szyhowski for evaluation; however, the Court granted Elliott's request for a new evaluator. (Filing No. 162.) Following the Bureau of Prison's determination not to re-designate Elliott to a new facility, Robin Watkins, Ph.D., ABPP ("Dr. Watkins") was the reassigned examiner. The dates of the second evaluation were January 3 to February 25, 2022.

In a report dated April 8, 2022, it was the opinion Dr. Watkins that Elliott is presently "competent to proceed with his case." (Filing No. 215.) On April 19, 2022, the parties appeared for an evidentiary hearing pursuant to provisions of 18 U.S.C. § 4247(d) to determine whether Elliott is presently competent to proceed with trial. The Government appeared by Assistant United States Attorneys Kristina Korobov and Tiffany Preston who presented testimony from Dr. Watkins. (Filing No. 226.) Elliott appeared in person and by counsel Brandon Sample and he presented testimony from Dr. Quentin Emerson ("Dr. Emerson"). Dr. Watkins was qualified as an expert.

**B.**     **Elliott's Background**

Elliott is a high school graduate who participated in special education classes due to a diagnosis of Attention-Deficit/Hyperactivity Disorder, Obsessive Compulsive Disorder and

3

Tourette's Disorder. He was home schooled for a time and later attended college to become an electrician, but never completed a degree. According to Dr. Watkins, Elliott "was fair to good historian" and "most of the information he provided was consistent with collateral sources, with the exception of some areas which he appeared to minimize, such as substance abuse history and negative family dynamics." (Filing No. 215.) He described his mother, Deborah Elliott, as "my world," adding that his grandparents are his "world," too, and that all three took good care of him. By contrast, records indicate that Elliott previously attempted to strangle his mother, and he has displayed intense anger toward both his mother and grandfather during monitored jail telephone calls, using expletives toward them. *Id*. at 4. The Court heard recordings of the verbally abusive jail conversations to his mother at the evidentiary hearing.

Elliott reported to Dr. Watkins that he had been in a number of motor vehicle accidents during adolescence leading to significant injury. He said he broke his neck when he crashed his dirt bike at age 15. He also recalled having "cracked [his] skull" in a crash at age 16. Elliott also reported suffering a head injury due to an assault while incarcerated. Records indicate Elliott was seen at an emergency room on January 8, 2011, for a concussion for which he required staples. Hospital records dated May 2, 2011, indicated a brain MRI was performed, with unremarkable results.[1]

According to records, Elliott was first arrested at age 13 or 14 for Criminal Mischief, at age 15 or 16 for Battery against an old friend, he was convicted in 2013 of Felony Theft and Obstruction of Justice and in 2016 convicted of Intimidation, Threat to Commit a Forcible Felony. *Id*. at 11. Elliott reported a history of alcohol, opioid, methamphetamine, marijuana, and cocaine use beginning when he was a young teenager. He reported smoking opioids daily. He was

---

[1] Dr. Watkins testified that nothing in Elliott's history of reported brain injury would cause a mental disease or defect rendering him incompetent.

4

prescribed the Xanax and the opioid Vicodin beginning at age 15. At the time of his evaluation, he was prescribed the antidepressant Prozac and the antipsychotic Seroquel. He described his compliance as intermittent, stating he flushes the medication when it consists of "fake pills." In 2015, he was admitted for one week to a treatment center after becoming aggressive with his family. The treating physician diagnosed Elliott with Bipolar I Disorder, Single Manic Episode, Unspecified.

### C. Evidentiary Background

During the competency and criminal responsibility evaluation at MCC with Dr. Szyhowski, correspondence from the prosecutor to Dr. Szyhowski dated October 9, 2019, indicates Elliott had been gathering information on how to "beat" the evaluation. An informant advised that Elliott quoted a movie, stating "that he was willing to 'stuff peanut butter up his' anus, pull it out, and eat it in front of the judge, to prove that he is insane." Dr. Szyhowski's competency report, dated December 10, 2019, indicates that Elliott spent most of the evaluation period in the Special Housing Unit ("SHU") because he used another inmate's telephone account and made statements on the phone about wanting to harm a nurse at MCC. There were also security concerns after it was suspected he had an updated picture of one of the alleged victims.

Dr. Szyhowski diagnosed Elliott with Borderline Personality Disorder with Antisocial Features; Major Depressive Disorder, Mild, In Partial Remission; Tourette's Disorder, by history; and Cannabis, Methamphetamine, and Opioid Use Disorders, In Partial Remission, In a Controlled Environment. Dr. Szyhowski opined that Elliott did not appear to be suffering from any severe mental disease or defect that has impacted his ability to understand the legal proceedings or assist counsel.

For his second evaluation, Elliott was first seen by Dr. Watkins for Forensic Intake on January 14, 2022. He was oriented to the evaluation process and asked several relevant questions including whether Dr. Watkins had obtained relevant information from his attorney. Elliott presented as eager to participate in the evaluation, and was consistently cooperative with interviews and testing. He expressed his intention to stay out of the SHU during the second evaluation. *Id*. at 13. He was successful in the intention. Because of the positioning of his cell, Dr. Watkins had to walk past Elliott's cell whenever she entered or exited the unit where her office is located and she was able to observe and interact with Elliott often during his evaluation period. Elliott departed the institution on March 10, 2022.

Throughout the evaluation period, Elliott was able to navigate the routines and structure of the facility without difficulty. He was observed socializing with inmates, and used the telephone frequently. He did not receive any incident reports during the course of the evaluation. Numerous calls were placed from his account and the reviewed calls were to his mother and grandparents. During the calls, Elliott provided accurate and detailed information about his evaluation status, timeline, and other relevant information about institutional rules and procedures. He frequently asked for updates regarding communications with his attorney and gave detailed instructions to his mother. There was periodic evidence of hostility toward individuals on sampled telephone calls. For example, Elliott attributed the lockdown to the Associate Warden and stated causally, "Hopefully that fucking bitch wrecks her car." He talked about being "ready to unleash havoc on this place." As discussed earlier, Elliott was often hostile and verbally aggressive to his mother in telephone calls. He frequently referred to her as "Bitch," as he talked, and expressed that she was "fucking up" what he had "going on."

According to Dr. Watkins, Elliott was consistently alert and oriented to time, place, person, and situation. His affect varied from neutral and calm to agitated and hostile, depending on circumstances. Thought processes were rational, relevant, coherent, and free of loose associations, tangentiality, or delusional content. Dr. Watkins conducted Psychological Test and Elliott's clinical profile consists of significant elevations across several scales. However, given his response style, Dr. Watkins believes these scales likely exaggerate the actual degree of psychopathology. Elliott's scale configuration suggests a person who is confused, emotionally labile, and angry. Elliott's most prominent scale elevation involved a scale reflecting marked peculiarities in thinking and experience, at a level of severity that is unusual even in clinical samples. He described poor judgment, impaired reality testing, unusual perceptual events, unusual ideas, social isolation and detachment, and thought processes that may be confused or blocked. There is significant documentation of early behavioral and legal problems well before Elliott was 15 years old. This pattern of behaviors is consistent with symptoms of Borderline Personality Disorder.

Elliott's VIP (Validity Indicator Profile) test results on both the Nonverbal and Verbal subtests were "Invalid", indicating that concurrently administered ability tests (such as the Shipley-2) should be interpreted with caution. His response style on that nonverbal subtest was "Irrelevant". Based on his tests results, the best conclusion is that Elliott did not intend to answer the items correctly, but he did not try very hard to answer them incorrectly, either. Elliott's response style on the Verbal subtest was "Inconsistent". The M-FAST was administered as a screening measure to obtain information regarding the probability that Elliott was malingering psychopathology. The most straightforward aspect of Elliott's presentation is his criminal history, which is long-standing and chronic, and consists of numerous acts that violate the rights of others.

Dr. Watkins diagnosed Elliott with Antisocial Personality Disorder, Borderline Personality Disorder, Other Specified Personality Disorder, Narcissistic Features, Sedative, Hypnotic, or Anxiolytic (Xanax and Klonopin) Use Disorder, Moderate, In a Controlled Environment and Opioid Use Disorder, Mild, In a Controlled Environment. (Filing No. 215 at 25.)

In her report, Dr. Watkins informed that Antisocial Personality Disorder is defined in the *Diagnostic and Statistical Manual of Mental Disorders—Fifth Edition (DSM-5)* as a pervasive pattern of disregard for and violation of the rights of others, occurring since age 15 years, as indicated by three or more criteria. Dr. Watkins opined that Elliott clearly meets six of the several criteria – a failure to conform to social norms based on his history of repeated arrests, deceitfulness, impulsivity (as detailed in records), irritability and aggressiveness (as reflected in records and reported by Elliott), reckless disregard for safety of self or others (as detailed in records), consistent irresponsibility (as exemplified by his inconsistent work history and failure to comply with supervision), and lack of remorse (as demonstrated during the present evaluation). Dr. Watkins explained that Elliott's antisocial behavior is far more pervasive, consequently, she assigned a diagnosis of Antisocial Personality Disorder.

Dr. Watkins further opined that Elliott meets eight of the nine diagnostic criteria for Borderline Personality Disorder. He has routinely displayed a sense of entitlement, arrogance, and interpersonal exploitativeness. Although these may overlap with traits of Antisocial Personality Disorder, they are also symptoms of Narcissistic Personality Disorder, and they appeared clinically distinct during the present evaluation. But because Elliott does not meet full criteria for this disorder, Dr. Watkins assigned a diagnosis of Other Specified Personality Disorder, Narcissistic Features. She explained that the evidence does not support a diagnosis of a psychotic disorder at this time nor a diagnosis of Malingering. Dr. Watkins opined that Elliott's antisocial and borderline

personality features are pervasive and characterological, and are unlikely to significantly change in the near future.

Concerning his ability to understand the nature of the proceedings, Dr. Watkins testified that Elliott showed a good appreciation of the potential penalties associated with conviction of his charges, (stating he could potentially face life in prison), and showed good understanding of the expectations associated with probation. He accurately described the meanings of each plea and the associated dispositions. For example, he defined a not guilty plea as "You're not guilty and you're gonna fight the case." Elliott demonstrated awareness of the adversarial nature of court proceedings and accurately described the roles and responsibilities of various court officials, including the defense attorney, prosecutor, judge, jury and witnesses.

Concerning his ability to assist counsel, Dr. Watkins testified that Elliott understood the need to communicate with his attorney regarding the facts of the case, and stated he has done so. He was able to accurately discuss the concept of attorney-client confidentiality and was aware of the need to communicate with counsel in the event of disagreement, inaccurate testimony, or need for clarification in court, and stated his willingness to do so. Elliott also displayed a good understanding of appropriate behavior in the courtroom, stating that a defendant should behave in an "orderly and quiet" manner in court. Dr. Watkins testified that Elliott's observed and documented behaviors show that he has the capacity to conform his behaviors and she saw no evidence that his personality characteristics impacted his competency or capacity to engage in behaviors to assist counsel.

When asked if he believes he has a mental illness, Elliott replied, "No…depression at time." He added, "My head ain't exactly right," citing his multiple head injuries. Elliott said he has suffered from "ADHD and OCD, as well as "depression" and sometime bipolar" in the past. In

describing the circumstances surrounding the alleged offenses, Dr. Watkins noted that Elliott was able to provide a cohesive narrative of events.

Based on the present evaluation and assessment described previously, Dr. Watkins opined as follows:

> [I]it appears Mr. Elliott does possess the capacity to assist counsel. Although it is clear that he routinely violates attorney directives and other advice that he acknowledges is reasonable, it is my opinion that Mr. Elliott's maladaptive personality traits (most notably, arrogance and entitlement combined with impulsivity and emotional reactivity) most directly lead him to ignore the rational advice of others as he engages in verbally aggressive behaviors. Mr. Elliott demonstrated very well during the present evaluation that he is able to comport himself in a respectful manner, as evidenced by his mostly appropriate discourse toward this examiner and his previous examiner while reserving disrespectful comments for conversations with others. Although this tendency will likely present a challenge for any attorney working with Mr. Elliott, and such challenges are likely to reflect volitional choices, rather than a lack of ability to comport himself appropriately. Based on the totality of these findings, it is my opinion that despite the presence of personality and substance use disorders, those disorders do not impair Mr. Elliott's ability to understand the nature and consequences of the proceedings against him, or to assist properly in his defense[, and] Mr. Elliott is competent to proceed at this time.

([Filing No. 215 at 27](#)).

Dr. Emerson is a family practitioner who provides medical services to inmates at the Clark County (Indiana) Jail. He saw Elliott on one occasion at the Clark County Jail. His testimony at the hearing was simply that Elliott

> came in – I was told he came in on Prozac and Seroquel, and the psych nurse took him off of the Seroquel and kept him on the Prozac. And it was my understanding that they offered him something else, and he refused. That was my – that was my understanding later on in the game.

Dr. Emerson provided no testimony or opinion concerning Elliott's competency to stand trial.

## II. CONCLUSIONS OF LAW

The standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a

rational as well as factual understanding of the proceedings against him." *Dusky v. United States* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). The relevant factors to be considered in assessing the issue of competency are a defendant's "irrational behavior, his demeanor at trial and any prior medical opinion on competence to stand trial. There must be some manifestation, some conduct, on the defendant's part to trigger a reasonable doubt of his competency." *Matheney v. Anderson*, 60 F. Supp. 2d 846 (N.D. Ind., 1999), aff'd and remanded, 253 F.3d 1025 (7th Cir. 2001).

The fact that a person suffers from a mental illness does not mean that he is incompetent to stand trial. *Drope v. Missouri*, 420 U.S. 162, 171–72, (1975); *Price v. Thurmer*, 637 F.3d 831, 833-34 (7th Cir. 2011). He need only be able to follow the proceedings and provide the information that his lawyer needs in order to conduct an adequate defense, and to participate in certain critical decisions, such as whether to appeal. *Id*. Effective ability to consult with counsel requires a capacity to work on a cooperative basis with counsel, to communicate relevant information to counsel, to understand counsel's communications, to evaluate counsel's advice, and to make decisions regarding the exercise of legal rights. *Martin v. Estelle*, 546 F.2d 177, 180 (5th Cir. 1977).

The procedure and test for evaluating competency are codified at 18 U.S.C. § 4241. *United States v. Wessel*, 2 F.4th 1043, 1053 (7th Cir. 2021). The testimony of a defendant's counsel may be especially valuable in a competency determination because counsel is the best witness of defendant's ability to consult with a reasonable degree of understanding. U.S. ex rel. *Mireles v. Greer*, 736 F.2d 1160, 1165–66 (7th Cir. 1984). However, the court is entitled to rely more heavily on psychological reports prepared by experts who perform more extensive testing on a defendant

and do a more thorough background investigation, *i.e.*, talking with witnesses and lawyers. *People of Territory of Guam v. Taitano*, 849 F.2d 431, 432 (9th Cir. 1988).

On the issue of competency to stand trial, the Government's burden of proof is by a preponderance of the evidence. Like prior counsel, Mr. Sample does not challenge the diagnosis of Dr. Watkins and concedes that Elliott understands the role of all parties and the nature of the legal proceedings. Also like prior counsel, Mr. Sample argues that Elliott is unable to assist in his defense based on his failure to follow counsel's advice, his engagement in sabotaging actions—such as disclosing attorney-client privileged information during telephone calls—and other behavior that is not within the ambit of properly assisting in the case. Counsel asserts that Elliott's behavior is tied to his borderline personality disorder which causes Elliott to engage in impulsive behaviors. For example, despite Mr. Sample's admonishments--to not discuss his case with anyone other than counsel, and his knowledge that all telephone calls from the jail are recorded and conversations could be used against him--Elliott attempts to talk on the telephone, often in code, realizing that it is not going to be successful, and continues to engage in this type of self-sabotage. Counsel argues this is not the kind of rational behavior that you would see from a defendant who is competent and who is, in fact, assisting properly in their own defense.

The Government asserts that Elliott's failure to comply with his attorney's advice is not evidence of incompetency, but more likely symptoms of his personality disorder. The Government argues that Elliott is a defendant who understands the legal system, applies his attorney's advice to stop talking on the telephone about his case when he should not by trying to find a work around (*i.e.*, talking in code) when he thinks it suits his needs. The Government points out that after reading Dr. Watkins' report, Elliott was able to identify something that he thought would discredit her. He said in a call "If I can discredit her on one point, perhaps she can be discredited in entirety".

The Government argues that Elliott has the capacity to comport himself, and when he does not, it is volitional and his choice.

The Court agrees. The Court relies heavily on the forensic reports of experts who have presented evidence concerning Elliott's competency. Dr. Watkins—a Board Certified Forensic Psychologist—provided a 27 page forensic report which is exhaustive and scientifically based. It is her opinion that despite the presence of personality and substance abuse disorders, Elliott maintains the ability to understand the nature and consequences of the proceedings against him, and to assist his attorney in his defense. (Filing No. 215.) Dr. Watkins saw Elliott's talking in code as a very calculated, planned and thoughtful way to try to convey messages to his mother, as opposed to a delusional behavior. She saw his talking on the telephone about attorney-client privileged matters as insightful, self-aware and planful decisions to do so, despite advisements to refrain, as opposed to impulsive behaviors. In other words, Elliott has the ability to choose certain behaviors recognizing the possible consequences.

The Court also considers the December 2019 diagnosis (borderline personality disorder with antisocial features) and opinion from Dr. Szyhowski, that "Elliott does not appear to be suffering from any severe mental disease or defect that has impacted his ability to understand the legal proceedings and to properly assist his counsel." (Filing No. 83-1 at 11.)

Dr. Watkins opined that Elliott's maladaptive personality traits--most notably, arrogance and entitlement combined with impulsivity and emotional reactivity-- directly lead him to ignore the rational advice of others, including his attorney. Similarly, since 2019, Elliott has described a willingness to communicate and be honest with his attorney, identified things he could do to improve the attorney-client relationship, and acknowledged the importance of being honest with his attorney. Although Elliott is a challenging client, his choices to ignore directives are his

volitional choices rather than the result of a mental defect. He has the capacity to listen and apply his attorney's advice, he has the ability to reason, calculate, rationalize and strategize and display what Dr. Watkins phrased as "self-awareness" and "insightfulness". No evidence has been presented which contradicts the expert opinions of these doctors. The evidence before the Court clearly shows that Elliott's mental diseases do not renter him mentally incompetent.

Finally, the Court notes that Elliott's demeanor at the April 2022 hearing (as well as at all prior hearings) was appropriate. He stood when required and could be observed consulting quietly with counsel during the hearing. The Court has considered Mr. Sample's observations and opinions; however, the Court affords great weight to Dr. Watkins's opinion. The Court is entitled to rely more heavily on psychological reports prepared by experts who perform more extensive testing on a defendant and do a more thorough background investigation. *Taitano*, 849 F.2d at 431, 432; *see also United States v. Birdsell*, 775 F.2d 645 (5th Cir. 1985) (the court was entitled to give more credence to reports prepared by doctors who reviewed more background information).

The Court recognizes that Elliott suffers from personality disorders which are mental illness under the DSM-5, however, mental illness does not necessarily preclude a person from being competent to stand trial. *See United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984). Based on the diagnoses and opinions of both Dr. Szyhowski and Dr. Watkins, the Court determines that Elliott is presently competent to stand trial or otherwise proceed with his case.

### III.  ORDER

Despite his mental health diagnosis, Elliott has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and has a rational as well as factual

14

understanding of the proceedings against him. Based on the testimony and evidence presented, the Court finds by a preponderance of evidence that Elliott is not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him, or to assist properly in his defense.

This case remains set for **final pretrial conference on Tuesday, August 2, 2022, at 9:00 a.m.**, and **trial by jury beginning on Monday, August 29, 2022, at 9:00 a.m.**, both in Courtroom 344 of the Birch Bayh Federal Building and United States Courthouse, 46 East Ohio Street, Indianapolis, Indiana.

**SO ORDERED.**

Date: 5/6/2022

_____
Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Brandon Sample
BRANDON SAMPLE PLC
brandon@brandonsample.com

Kristina M. Korobov
UNITED STATES ATTORNEY'S OFFICE – Indianapolis
kristina.korobov@usdoj.gov

Tiffany Jacqueline Preston
UNITED STATES ATTORNEY'S OFFICE – Indianapolis
tiffany.preston@usdoj.gov